## JOHNSON *et als. vs.* CULBREATH.

A. testator bequeathed a negro girl and her increase to his grand children, and provided that the negroes should remain undivided until the youngest child arrived at the age of twenty-one years, and should then be divided among those who were living. A division was made among the children before the youngest had attained his majority, and he afterwards filed a bill to have the division set aside, alleging that he had not received an equal share with the others. *It was held*—

1. That the bill would not be dismissed by the appellate court on account of a formal defect in not offering to account for the negroes which the complainant had received, the objection not having been taken in the primary court.

2. That the negroes were exempt from execution at law against any of the legatees, until the youngest child had arrived at the age of twenty-one, and a division had been made pursuant to the will.

3. That until that time, the marital rights of the husband of a *feme covert* legatee did not attach, although he had possession of some of the negroes as bailee.

4. That one of the legatees who disclaimed all interest in the negroes, having sold his interest to another legatee before the division was made, was a competent witness for the complainant to prove his minority at the time the division was made.

ERROR to the Chancery Court of Benton. Tried before the Hon. D. G. Ligon.

BELSER & HARRIS, & J. B. MARTIN, for plaintiffs in error.

RICE & MORGAN, *contra.*

CHILTON, J.—This bill was filed on the 12th day of June, 1847, by Niven D. S. Culbreath, to set aside a division made of certain slaves on the 1st day of January, 1846, which slaves had been bequeathed to the children of Barbara Culbreath, by the will of their grand father Malcolm McPhail, late of Cumberland county, in the State of North Carolina, on the ground that at the time said division was made, the complainant lacked some twelve months of being twenty-one years of age, and that the share which was allotted to him was not equal in value to one-fifth of the entire property, to which he was entitled. It appears that the legatees interested agreed on the division, and that the slave assigned to the complainant was received by him, and was in his possession when he exhibited his bill.

Mrs. Johnson claims to be a *bona fide* purchaser of one of said slaves under an execution against the party to whom said slave was allotted by said division. The will of McPhail requires that the slaves shall remain undivided among the legatees, until the youngest of them arrives at age; the complainant in the bill being the youngest. The complainant does not deny that the division was made by his consent, but he avers that the same " was partial in its character, unequal and not designed to be final, and not committed to writing; that all the legatees were not present when it was made, and that the girl assigned to complainant lacked $300 of being equal to one-fifth the value of all the slaves to be divided."

The complainant, although he states in his bill that he has the slave assigned him in the division, makes no proposal to

bring her forward, nor to account for hire, and the testimony of Caldwell Sublett, David B. Crider and Neal Furguson shows very satisfactorily that since the division, in a legal controversy respecting a portion of said property and the legality of said division, the complainant, on his examination as a witness touching these facts, stated that he was twenty-one years old when the division was made, and that he was satisfied therewith. Sublett swears positively to this fact, and the other witnesses named corroborate his testimony. It does not appear, however, that Johnson was at all influenced by any such representations to make his purchase, or that his purchase was subsequent to the time they were made. Nor does the record show that any action was taken, based on such statements, so as to make the declarations operate as an estoppel upon the complainant.

As to complainant's failure to make a formal tender of his readiness to account, and to have the slave in his possession forthcoming, we should be inclined to hold that had such failure been made the ground of demurrer by specific objection, the demurrer should have been sustained and leave given to amend. But it does not appear to have been one of the grounds insisted on in the court below, nor is it mentioned in the demurrer. It would be opposed to the uniform practice of this court to dismiss the bill for a formal objection, which, so far as the record discloses, is sprung for the first time in this court, and which, if made in the court below, could have been readily avioded.

Aside, however, from this view, the decree of the learned chancellor disposes of the case as though the bill contained the proposal to submit the property in possession of the complainant to the disposal of the court, with its issues and profits, and should the complainant fail to have such property forthcoming, to abide any decree or order the chancellor might make, it would be entirely competent for the chancellor to dismiss his bill; for the object of his bill, which is for an equitable division of the whole property, could not be made without the production of the property in his possession.

We have examined with much care the authorities relied upon by the counsel for the plaintiffs in error, as showing that the decree of the chancellor was erroneous ; but we feel satisfied that they do not sustain the proposition to which they are cited, to the extent contended for.

These slaves were " to *remain undivided*" among the children of Flora Culbreath, until the youngest child attained his majority, when they were to be equally divided among those of the children who survived until that period. It was then the duty of the executor to see that this provision in the will was carried out, and it appears that up to the time of the alleged division, he controlled the slaves either by himself or others.

Until the youngest child arrived at age, the executor had no power to make the division among the legatees; for until that period arrived, it could not have been determined who were the persons to take, the right depending on the survivorship; and until that period no such interest could vest in Barbara Cannon, one of the legatees, as would go to her husband upon her decease, or to his representative upon his death. So long as the slaves in contemplation of law remained in the hands of the executor, awaiting the arrival of the period when they were to be divided, and the respective shares to vest in possession of the legatees according to the will of Malcolm McPhail, just so long are they exempt from execution at law, nor can the marital rights of the husbands of the *feme covert legatees* attach. The proof in the cause sufficiently shows that the complainant was not of full age, until February, 1847, before which time no division could lawfully have been made, and anterior to which period, Barbara Cannon's right of survivorship attached, her husband having died in 1844. It is very clear then, that her husband acquired no right to this property. If his possession was otherwise than that of a bailee of the property, it was tortious and acquired in violation of law, as well as of the express provisions of the will of McPhail, and such possession would not entitle him *jure mariti* to the property. He must have held the property as husband, and not on hire, as the proof shows he held in this instance.—Terrell x. Greene, 11 Ala. 216; Andrews & Brothers v. Jones, 10 Ala. 426; Mayfield v. Clifton, 3 Stew. 375; Bibb v. McKinsley & Hopkins, 9 Por. 636; Vanderveer v. Alston, 16 Ala. 494; Randall v. Shrader, 17 ib. 338. These cases from our own court very clearly show that no such interest vested in Cannon, as would justify a recovery by his administrator, and consequently the cross bill of Willis, which seeks to subrogate him to the rights of Cannon's administrator, was properly dismissed. It results also, that the chan-

cellor did not mistake the law in dismissing the cross bill of Johnson; for unless the interest of the legatees was such, as could have been sold under execution at law, Johnson could acquire no title by his purchase. His title therefore depends altogether upon the validity of the division which was made, and this we have seen was invalid by reason of the non-age of the complainant. In contemplation of law, the property is in the hands of the executor who took upon himself the execution of the trust imposed by the will, namely, to keep this property, which was not to be divided among the children to whom it was bequeathed until the youngest arrived at full age, at which time the survivors of them should share it equally in severalty. Till then, the legatees were not entitled under the will to the possession; and the constable had no power to seize and sell it upon an execution against any of the legatees, as he could not take possession of it without doing violence to the will of the testator, according to our construction of the will. The defendants in execution, at the time of the sale, had no legal interest in the property sold; if they survived until the period for the division, the defendants were then entitled to distributive shares in the slaves, but they had, as we have said, no right to the possession. This view distinguishes this case from those cited, which show that the interest of one tenant in common may be sold under execution at law.

As to the deposition of Elijah Culbreath, the only one objected to before the chancellor, we are clear in the opinion that he was a competent witness to prove the facts to which he deposes. If he had any interest, as is well remarked by the chancellor, it was opposed to the party who introduced him. He was in other words interested in sustaining the division which had been made, as by it he got a greater interest than he can get under an equitable division which the court is called upon to make. But he explicitly states that he has no interest, having disposed of all his interest in 1844, some three years before the bill was filed.

We have been unable to see any error in the decree of the chancellor. It is consequently affirmed.